THE PEOPLE *ex rel.* THE DEPARTMENT OF REHABILITATION SERVICES *et al.*, Plaintiffs-Appellants, v. JOHN F. CONAGHAN *et al.*, Defendants-Appellees.

Fourth District   No. 4—96—0738

Argued March 11, 1997.—Opinion filed September 11, 1997.

754

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Susan Frederick Rhodes (argued), Assistant Attorney General, of counsel), for appellants.

Janet M. Cartwright (argued), of Equip for Equality, Inc., of Rock Island, for appellee John F. Conaghan.

Michael J. Tibbs (argued), of Miller, Hall & Triggs, of Peoria, for appellee Pekin Community High School District 303.

JUSTICE KNECHT delivered the opinion of the court:

John Conaghan (John) was born in September 1977. He has multiple disabilities, including a severe hearing impairment, a behavior disorder, and he is developmentally disabled. For most of his life, John has been educated in his home school district and in various private facilities. In September 1994, John and Margy Conaghan, John's parents, applied to enroll John at the Illinois School for the Deaf (ISD). ISD denied John admission in January 1995, despite the fact Pekin Community High School District 303 (Pekin), the Conaghans' local school district, supported the placement. ISD denied John's admission because (1) his hearing loss was not his primary handicap, and (2) even if it were, ISD could not meet his needs because of the severity of his other handicaps. An administrative hearing officer upheld ISD's admission decision when the Conaghans sought administrative review, but after receiving additional testimony and evidence, a level II officer reversed the level I decision and ordered ISD to admit John. ISD and the Department of Rehabilitation Services (DORS) appealed the level II decision to the circuit court of Sangamon County, which affirmed. This appeal followed. We affirm.

# I. BACKGROUND

## A. Level I Hearing

The level I hearing (see 89 Ill. Adm. Code § 800.20 (1996)) was originally set in June 1995. It was continued to allow for an independent examination of John. The independent examiner, Jeanne Karlecke, testified for the parents at the level I hearing in August 1995. Her testimony, as well as that of Mickey Jones, the director of the evaluation center at ISD, dealt primarily with John's ability to benefit from being placed in an environment where sign language was constantly used.

Karlecke, a school psychologist at the Wisconsin School for the Deaf (Wisconsin), observed John for four days in July 1995. She also reviewed the records kept on John at Heartspring, a facility for mentally handicapped and behavior-disordered children in Kansas at which he was then residing, and before. She believed John's hearing impairment was his primary disability. She noted he could not be taught anything, including behavior modification, until he could communicate. She believed language development was the most important thing for John, and he would only develop a language base in an environment in which sign language was always used, 24 hours a day. She agreed John would have to be in a self-contained classroom and would, at least initially, need a one-on-one aide 24 hours a day.

Karlecke did not know the Illinois definition of a "primary disability" (Wisconsin does not classify disabilities as primary or secondary), but used the term to refer to that which was "preventing John from making progress academically and educationally." Two witnesses familiar with Illinois special education laws defined it as the disability that "impacts the individual most educationally" (Judy Pierce, director of the Illinois Service Resource Center) and that "has the greatest adverse effect on the child's educational performance" (Michelle Windle, director of special education at Pekin). When asked "[d]eafness is always primary, is that correct?" Karlecke answered in the affirmative. However, this was in the context of a series of hypothetical questions about a student who was both deaf and blind. Soon after she clarified: "I don't say that deafness is always the primary responsibility, [sic] because *** we have children who are deaf, who are emotionally disturbed and the emotionally disturbed is [sic] their primary handicap and we know it is their primary handicap. *** It depends on the child individually." She believed a deaf child could have a behavior disorder that is his or her primary disabling condition, i.e., it depends on "the whole situation, what is causing the behavior problems. When there is a lack of early communication, you have to question which is the primary handicap."

On cross-examination, Karlecke was asked how she reconciled her testimony deafness was John's primary handicap with the fact nearly all of the specific recommendations in her written report related to John's behaviors. She reiterated her behavioral recommendations all required language to implement. No progress could be made in any arena, including behavior modification, until John could communicate. She noted John's reports all indicated his behavior worsened when a new person entered his environment, but it did not with her. She attributed this to her ability to communicate with him.

She recognized Illinois had previously diagnosed John's primary handicap as his behavior disorder, but she disagreed. She also did not believe he had pervasive developmental disorder (PDD). She agreed John would probably never be able to use "how" and "why" questions, but thought he had the capacity for much fuller communication than his current language skills allowed him. In her opinion his signing improved measurably during the four days she was present.

Jones, by contrast, testified he believed the change Karlecke observed in John's signing was not really learning, but simply "echoing" of her signs. He disagreed with Karlecke's opinion John's communication would improve if he were placed in a 24-hour signing environment; he believed John had PPD, a neurological disorder that would preclude him from developing language even in an environment where he had access to it. He based this in part on the fact John did not speak well.

John is not totally deaf; in his better ear he only has a severe hearing loss. Jones believed this meant John "would have a whole lot of residual hearing that could be used for the development of spoken English" with adequate amplification, and his limited speech ability indicated John had a language disorder in addition to his deafness. He testified an assessment done several years earlier at "CID" had rated John's receptive scores for speech and sign language the same. The 1982 evaluation by the St. Louis Central Institute for the Deaf (Institute) is contained in the record. The Institute noted John's hearing aid would increase loudness but would "not provide him with normal hearing. We would expect him to experience difficulty with the clearness of speech, even with his hearing aid, due to the sensorineural nature of his hearing loss." The same report concluded "[a]lthough his sign language skills are delayed, John exhibits the ability to learn to express himself in sign."

Jones noted a November 1992 report by Alex Slappey observed John had previously been diagnosed with PDD (*i.e.*, Jones did not actually diagnose John with PDD, nor did Slappey, although both believed his behaviors were consistent with it). PDD is a neurologi-

cally based disorder and is qualitatively different from normal deafness. Jones explained most deafness resulted from a problem with the inner ear. A person with this type of deafness could learn American Sign Language (ASL) in the same amount of time it would take a hearing child to learn spoken language.

In persons with PDD, on the other hand, a problem with the brain itself blocks language development. Jones's belief that John suffered from PDD led him to conclude John would not be able to acquire language even if it were made available to him through a 24-hour signing environment. He admitted he was not a neurologist, nor had he seen any medical report from a neurologist stating John had any neurological condition that would prevent him from acquiring language. The only neurologist's report in the record before this court diagnosed John with "[b]ilateral sensorineural hearing loss, and behavioral problems resultant." This 1988 report, by William Svoboda, made no mention of PDD.

Jones differentiates between language and vocabulary, and it is the former, "a knowledge of rules," that he believed John would never acquire. He believed language acquisition began at birth, and "the longer that you wait, the more—the less fluent the person is in using the rules in the language." The only time he ever believed John had been in an environment where he could have begun to learn the rules of a language was one year when he attended the Sterling School (Sterling), when he was three years old. John's father had previously testified when John was attending Sterling he "made—he was developing a language base. I mean actually talking. He would say juice, toast, dad; and it was a totally deaf environment." He testified he and his wife had been trying to get John back into a full-time deaf education program since he left Sterling, but had never been able to because of his behaviors. He had been asked to leave Sterling because he was fascinated with lights and liked to turn the classroom lights on and off. Karlecke believed the level of signing at Heartspring was generally very poor; she gave the example John's teacher signed "today" by putting together the sign for "to," as in going "to" something, and "day." John's aides told her they learned some sign language from John.

The question of John's ability to benefit from a full signing environment was not the only reason given for the denial of admission. Another issue was whether ISD could appropriately program for John's other disabilities. ISD was especially concerned with four incidents during the summer of 1995 in which John inappropriately touched female students, attempting either to touch their breasts or put his hand into their shorts. There was also a report of John inap-

propriately touching an aide in November 1993, trying to lift her shirt and remove her pants.

When Karlecke was questioned specifically about these occurrences, she stated she did not believe John was dangerous; as long as he had a one-on-one aide, he would not present a danger to others. She noted the incidents occurred during group activities, where the aides did not go along one-on-one, and John stopped when he was told to stop by whatever adult was present. She had earlier noted the aides would, as a group, watch the students as a group during schooltime activities.

Brad Johnson is the student services case manager at Heartspring. Johnson said John was always accompanied by an aide, although different people were with him at different times during the day. The majority of students at Heartspring had one-to-one aides. He testified Heartspring had a sex-education program (called the "Circle Program"), the purpose of which was to help students recognize the appropriate level of physical contact with others. John was enrolled in the Circle Program. Johnson noted John's inappropriate touching dropped after the four incidents noted above, and the behavior generally increased in the spring, when students began wearing shorts, and during swimming activities. He testified John's inappropriate behaviors had generally decreased a great deal in the preceding two years.

He noted as John's ability to communicate increased, his maladaptive behavior decreased. He believed John's behavior and communication "go hand-in-hand." Most aides did not have any signing ability when they began their Heartspring employment, although they did have to take one course in it, which met for a total of eight hours over the course of two months. The educational staff were not even required to take this course. He did not believe Heartspring was providing John an "appropriate level of sign language environment," although the communication was appropriate for John's then-current individualized education program. He testified Heartspring was a 12-month program, and he believed John did need to be in school during the summer.

Michelle Windle agreed John needed activities during the summer, but was not sure a summer school program *per se* was necessary. She testified John was in a trainable mentally handicapped (TMH) program at Pekin for almost the complete school year 1992-93, and during that time she was aware of no incidents of inappropriate touching of other students, although he might occasionally grab a teacher or aide too roughly and leave a mark. She heard no reports of any aggression at home, and at school the only bad behaviors were

kicking walls, which the teacher solved by taking his shoes when he did it. She thought John's aggressive behaviors escalated after he left Pekin because he had a difficult time adjusting to changes in his environment. He left Pekin because his parents wanted him to have after-school activities, which Pekin did not offer; they believed he would have more interaction with other people in a 24-hour-a-day program. She made applications to 10 or 12 different facilities for John before Heartspring accepted him. Some facilities were unable to program for all of his needs, while others were willing to accept him but were full. She thought Heartspring was meeting John's behavior management needs but not his communication or academic needs. She stated Pekin was willing to pay for a 24-hour-a-day, 7-day-a-week, one-on-one assistant for John at ISD. She thought ISD was an appropriate placement for John because he needed a 24-hour signing environment to develop his sign vocabulary and communication skills.

Jess Chapman, director of admissions and records at ISD, did not believe ISD could program for John because the environment was not secure enough for him. He thought John's behavior would put him at risk for himself and trying to place John at ISD would "set him up for an awful lot of failure." His concerns were greatest after the school day, because John's time would be less structured, but his opinion was not changed by the possibility of having a one-on-one aide or by Karlecke's report. He knew of the self-contained classroom at ISD, but knew very little about it.

Charles Nash is the ISD director of student life. He was involved with John's admission decision regarding the possibility of programming for him in the dormitory. He did not think the other students would accept John's behaviors (especially masturbation and inappropriate touching) in the dorm setting and believed "the behaviors that he was exhibiting would really be detrimental to his well being." He believed no one else was functioning on his level, so he would have no true peers at ISD. Neither Karlecke's report nor the possibility of a 24-hour aide changed his opinion, because John's behaviors had not entirely stopped at Heartspring despite the 24-hour aide. He also noted there were strict policies regarding sexual interaction between students and rules requiring reporting to the Department of Children and Family Services (DCFS) of inappropriate sexual conduct.

Cathryn Vincent, the social work administrator at ISD, also did not believe John should be admitted to ISD, because he could not function at the appropriate emotional, academic, or intellectual level. Vincent testified she was required to report any allegation of abuse

or neglect to DCFS, and if DCFS found the report "indicated," it could require ISD to remove the student from the school. She reviewed the Heartspring reports relating to sexually inappropriate touching and believed she would have had to report the incidents had they occurred at ISD.

Joan Forney, superintendent of ISD, felt John's primary need was a very structured, consistently enforced, behavior-management plan, which ISD could not provide. She thought the ISD system for controlling violence (crisis prevention intervention (CPI)) would be inadequate to control John, based on the behaviors his records revealed. She confirmed ISD had no time-out room and no doors. She noted 34% of the students at ISD had secondary handicaps, but even when asked to assume John's primary disability was hearing impairment, which she did not believe, she felt ISD could not program for him. Especially troublesome were the DCFS reporting requirements—she felt ISD would have had to report several of the incidents in which John had been involved at Heartspring, and in her experience when DCFS conducted an investigation the school either had to guarantee DCFS it would not happen again or remove the child from the school. She also noted since John was now over 16 the incidents could be criminal matters. She felt a one-on-one aide would not ameliorate the problems because the incidents at Heartspring occurred in the presence of adults.

She also noted just getting aides could be very difficult. There was another student at ISD who required one-on-one aides for personal care and ISD had not been able to hire aides who could sign; the personnel were simply not available. She believed the recommendations Karlecke made in her report would be an "overburdensome change" in ISD's program.

Charles "Steve" Tavender, the ISD high school principal, also felt ISD could not appropriately program for John, for several reasons. First, John's history of eloping: the physical layout of the school would be a problem, as neither the classrooms nor janitor closets have doors and there are at least four readily accessible exits from the high school. With respect to academics, he understood John needed a program emphasizing daily living skills, on the order of grooming or toilet training; such a program was not available in the high school, because the students were all academically oriented and took at least one vocational class per year. He presumed John would be in the semi-self-contained classroom, but he testified none of the students currently therein had any behavior problems. There were no other students with the same complexity of disabilities as John in the high school. Karlecke's report did not change his opinion, because

he believed it contained a lot of contradictions and most of John's behaviors still existed.

The level I order kept John at Heartspring, but required all of his aides henceforth to be fluent in ASL.

## B. Level II Hearing

The Conaghans filed for level II administrative review (see 89 Ill. Adm. Code § 800.190 (1996)). The level II hearing was held on November 29, 1995. Four witnesses testified. Only one (Forney) had testified at the level I hearing. It was also brought to the level II officer's attention that a multidisciplinary conference (MDC) in November 1995 had reordered John's disabilities, labeling his hearing impairment primary and his behavior disorder and mental handicap secondary.

At the time of the hearing, Andrea Simeone had been the teacher in ISD's "semi-self-contained" classroom for three months. Before coming to ISD Simeone had worked for the Illinois Center for Deafness (Center) for 10 years. The Center—or at least the part of it with which Simeone had been involved—was "a small private school not-for-profit specifically designed for students who are hearing-impaired but have additional diagnoses of behavior disorders, emotional disturbance or mental illness." For about six of her years at the Center she was a classroom teacher and had taught students with schizophrenia, manic depression, and psychotic major depression, and "[m]any of them were aggressive or had aggressive tendencies. I don't know what the word is now, but defiant, defiant behaviors."

The ISD semi-self-contained class contained five deaf students with secondary disabilities. Four were educable mentally handicapped (EMH) and one was TMH; one (the record does not reflect whether it was the TMH student or one of the EMH students) was also behavior disordered, although he had not recently been exhibiting many inappropriate behaviors. Simeone testified none of the students were aggressive or exhibited sexually inappropriate behavior; she had only had to use "time-out" about three times in the last year.

Kathleen Lowman, director of education at Heartspring, testified by teleconference. She had been in this position only since July 1995, but she had read John's records and observed him personally to some extent (six or seven times, for about five minutes each time). Heartspring was not a locked facility, but she was not aware of John ever trying to leave Heartspring's grounds. She stated whether John's hearing impairment was primary or secondary would not change how Heartspring programmed for him. Heartspring had not hired

any deaf educators or teachers certified in deaf education since the level I hearing, nor had it been able to find anyone trained in ASL for the staff. They had changed John's one-on-one aide to Cheryl O'Brien, the most proficient signer on staff, and Lowman observed John seemed very interested and in tune with her.

O'Brien also testified by telephone. She became John's one-on-one aide in October 1995 and was with him every day from 8:30 a.m. to 3:30 p.m. She thought John's expressive language skills were not as good as his receptive skills, although she had been able to motivate him to sign to her in up to five-word sentences. For the most part she was very able to understand John's wants. She had not observed him exhibit any aggressive behaviors in the four weeks she had been working with him.

Finally, Forney testified briefly about living arrangements that might be available to John as an alternative to the ISD dormitories. She noted her discussion of the possibilities did not mean she thought ISD could program for John effectively; she still had the concerns she raised at the level I hearing.

The level II hearing officer reversed the level I decision and ordered John placed at ISD and required him to have a one-on-one aide 24 hours a day, at Pekin's expense. It specified John's aides and teachers were required to be fluent in sign language. Finally, it required "AN ALTERNATE RESIDENTIAL PLACEMENT TO MEET THE STUDENT'S NEEDS AND THAT OF ISD'S SECURITY CONCERNS SHALL BE PROVIDED."

## C. Circuit Court Review

ISD and DORS filed an action (see 89 Ill. Adm. Code § 800.20 (1996)) under section 3—110 of the Administrative Review Law (735 ILCS 5/3—110 (West 1994)) in the circuit court of Sangamon County. The arguments were not transcribed. By docket entry the court found the level II result was "neither contrary to law nor against the manifest weight of the evidence and is accordingly affirmed."

## II. ANALYSIS

### A. Alleged Errors of Law

ISD first argues the level II officer erred in the issues she addressed. ISD asserts the only proper issue was whether its denial of admission failed to comply with DORS' regulations, and it contends the officer should not have addressed the questions of whether ISD was an appropriate placement, whether Heartspring was an appropriate placement, whether John had a right to a deaf education and whether Pekin had failed to provide John a free appropriate public

education. It correctly notes this question of law is subject to *de novo* review. See *Illini Country Club v. Property Tax Appeal Board*, 263 Ill. App. 3d 410, 416, 635 N.E.2d 1347, 1353 (1994), *appeal denied*, 158 Ill. 2d 551, 645 N.E.2d 1358 (1994).

■ However, even if the only issue properly before the officer was whether ISD violated DORS' rules, those rules require ISD to accept all children with a primary disability of hearing impairment for whom it can create an appropriate program. ISD must admit Illinois residents between 3 and 21 years old who have been diagnosed as having a hearing impairment, "including those with secondary disabilities," in accordance with section 765.10(d) of title 89 of the Illinois Administrative Code (89 Ill. Adm. Code § 765.10(d) (1996)), if space is available "and it has been determined, through an application and evaluation process, that ISD can provide an appropriate program." 89 Ill. Adm. Code § 755.30 (1996). Behavior disorders and mental handicaps are among the secondary disabilities for which ISD must program if it "appropriately" can. See 89 Ill. Adm. Code §§ 765.10(d)(3), (d)(4), (d)(6) (1996). Thus ISD violated DORS' rules by refusing to admit John if his primary disability is hearing impairment and it can appropriately program for him.

■ The level II officer noted John's hearing impairment was his primary disability according to the November 1995 MDC conference and found "very little modification" would be required for ISD to meet John's needs. After considering the separate issues of security, residential issues *and ISD's ability to program for him*, the officer found ISD was the "appropriate placement" for John. The conclusions John's hearing loss was his primary disability and ISD could appropriately program for John lead to a legal determination ISD violated the above rules by not admitting him. Ordering ISD to admit John was an appropriate remedy. Even if the other issues were not properly before the officer, she did not order additional relief against ISD based on any of those issues. An error of law is not grounds for reversal where the judgment is correct. *Ehredt v. Forest Hospital, Inc.*, 142 Ill. App. 3d 1009, 1012, 492 N.E.2d 532, 535 (1986).

## B. Sufficiency of the Evidence

■ The other arguments ISD presents take issue with certain factual conclusions the hearing officer reached. The factual findings in a final administrative order are *prima facie* true and correct. 735 ILCS 5/3—110 (West 1994). Reversal of an agency's factual conclusions is warranted only if against the manifest weight of the evidence, meaning "unreasonable, arbitrary, and not based upon any of the evidence." *Illini Country Club*, 263 Ill. App. 3d at 417, 635 N.E.2d at 1353.

### 1. *The Finding John's Hearing Impairment is his Primary Disability*

■ ISD first argues the level II officer erred in concluding John's hearing impairment is his primary disability. It asserts she "ignored" the fact John's primary disability had always previously been diagnosed behavior disorder or mental handicap, and notes Karlecke "acknowledged that the most recent [MDC] governing John's [individualized education plan] found his primary disability to be behavior disorder."

This was true when Karlecke testified, but the November 1995 MDC reordered John's disabilities so his primary disability was hearing impairment. The level II officer noted the November 1995 MDC and its results in her findings of fact. All persons required to attend the MDC (see 23 Ill. Adm. Code § 226.560(b) (1996)) were present.

John does not question whether ISD may challenge the hearing officer's conclusion regarding primary disability when it was based on an MDC. Assuming for purposes of this appeal it may do so, we nevertheless do not find the result against the manifest weight of the evidence. Experts testified on both sides of the issue, and the hearing officer was entitled to give credence to whomever she found more believable. John's previous diagnoses were brought to her attention and given the weight she thought appropriate. The evidence is simply not so one-sided as to lead this court to reverse the level II officer's conclusion John's primary disability was his hearing impairment.

### 2. *The Finding John's Inappropriate Behaviors Have Decreased*

■ ISD argues the testimony of Lowman, O'Brien and Karlecke is insufficient to support a conclusion John's behaviors had decreased because they had only observed John for very short periods of time. We disagree. First, the brevity of their contact with John would not necessarily lead to reversal even if their testimony was the only support for the hearing officer's conclusion. Part of the Conaghan's argument is John's behaviors are the result of his inability to communicate, and O'Brien and Karlecke are practically the only persons in John's educational environment in recent times with the ability to sign.

Nor was this the only evidence before the officer. Johnson testified John's behaviors had decreased greatly over the preceding two years, and charts tracking John's behaviors on a week-to-week basis from May 1993 through July 1995 were adduced. Windle testified John's behaviors had been very infrequent during the 1992-93 school year during which he had been at Pekin, where there had been a fluent signer teaching him. There was sufficient evidence to support the officer's conclusion.

### 3. *The Finding ISD is an Appropriate Placement for John*

■ ISD finally argues it is simply not an appropriate placement for John. We affirm, based primarily on the revised MDC, Andrea Simeone's testimony and Pekin's provision of an aide 24 hours a day.

Simeone had been teaching severely disabled deaf students for six years before she came to ISD. The ISD "semi-self-contained" classroom already contained five students with mental handicaps, one diagnosed as behavior disordered. The level II officer characterized Simeone as a "teacher who is a deaf educator and someone familiar with behavior[-]disordered children." The fact she was teaching at ISD was one of the reasons the officer found "ISD DOES NOT REQUIRE MODIFICATION TO MEET STUDENT'S EDUCATIONAL NEEDS[.]" We reject ISD's argument regarding her "qualification to teach special education students with behavior disorders." Not only did she teach severely disordered children during the six years she taught at the Center, ISD has employed her to teach deaf students with, according to her own testimony, all of the secondary handicaps with which John has been diagnosed (EMH, TMH and behavior disorder). At least one student in her class at ISD was both behavior disordered and mentally handicapped. We cannot overturn the hearing officer's conclusion Simeone is capable of dealing with such students.

ISD also argues a 24-hour aide will not suffice to protect John—or the other students—because he misbehaved at Heartspring despite his 24-hour aide. This argument is not without logic, but it overlooks certain facts. First, as noted, both Karlecke and O'Brien testified John was not aggressive when they signed to him, and so far as the record reveals they were the only two people in John's educational setting in the last few years who were conversant in sign. Since the aide at ISD must be fluent in sign, there is some rational basis for believing John might be less likely to act inappropriately. Regarding the aide's ability to prevent John from acting out if he attempted to do so, it is worth noting *all* of the students at Heartspring were mentally handicapped or behavior disordered. Karlecke noted the aides would, as a group, watch the children as a group. It is reasonable to infer a single aide might be more alert to the activities of a single student than a group of aides would be to the activities of one student in a large group.

## III. CONCLUSION

Both parties raise legitimate concerns for the welfare of innocent parties, which makes this a difficult case. John and Pekin raise the disturbing specter of a young man who is being deprived of what may

be his last best chance to learn to communicate. ISD has a duty to protect all of its students. There is potential for harm—including adverse consequences for John—if John engaged in sexually inappropriate behavior, and he could possibly have a disruptive effect on the school as a whole even without doing so.

We are not experts in this field. The level II officer, who is, had before her over 2,000 pages of documents and testimony. Contained therein is evidence supporting her decision, as well as evidence that might arguably support the opposite conclusion. Our task is not to implement the result at which we might have arrived were we in the hearing officer's place. Rather, we are to determine whether the hearing officer's order was within the bounds of the law and evidence. We find it was and affirm.

Affirmed.

GARMAN and COOK, JJ., concur.